# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 30, 2014

No. 11-50792

Lyle W. Cayce
Clerk

JESUS C. HERNANDEZ, Individually and as the surviving father of Sergio
Adrian Hernandez Guereca, and as Successor-in-Interest to the Estate of
Sergio Adrian Hernandez Guereca; MARIA GUADALUPE GUERECA
BENTACOUR, Individually and as the surviving mother of Sergio Adrian
Hernandez Guereca, and as Successor-in-Interest to the Estate of Sergio
Adrian Hernandez Guereca,

Plaintiffs–Appellants

v.

UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES BUREAU OF CUSTOMS AND
BORDER PROTECTION; UNITED STATES BORDER PATROL; UNITED
STATES IMMIGRATION AND CUSTOMS ENFORCEMENT AGENCY;
UNITED STATES DEPARTMENT OF JUSTICE,

Defendants–Appellees

consolidated with 12-50217

JESUS C. HERNANDEZ, Individually and as the surviving father of Sergio
Adrian Hernandez Guereca, and as Successor-in-Interest to the Estate of
Sergio Adrian Hernandez Guereca; MARIA GUADALUPE GUERECA
BENTACOUR, Individually and as the surviving mother of Sergio Adrian
Hernandez Guereca, and as Successor-in-Interest to the Estate of Sergio
Adrian Hernandez Guereca,

Plaintiffs–Appellants

v.

JESUS MESA, JR.,

Defendant–Appellee

No. 11-50792

consolidated with 12-50301

JESUS C. HERNANDEZ, Individually and as the surviving father of Sergio
Adrian Hernandez Guereca, and as Successor-in-Interest to the Estate of
Sergio Adrian Hernandez Guereca; MARIA GUADALUPE GUERECA
BENTACOUR, Individually and as the surviving mother of Sergio Adrian
Hernandez Guereca, and as Successor-in-Interest to the Estate of Sergio
Adrian Hernandez Guereca,

                                        Plaintiffs–Appellants

v.

RAMIRO CORDERO; VICTOR M. MANJARREZ, JR.,
                                        Defendants–Appellees

---

Appeals from the United States District Court
for the Western District of Texas

---

Before DeMOSS, DENNIS, and PRADO, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

This case involves a foreign national's attempt to invoke constitutional
protection for an injury that occurred outside the United States. United States
Border Patrol Agent Jesus Mesa, Jr. ("Agent Mesa"), standing in the United
States, shot and killed Sergio Adrian Hernandez ("Hernandez") Guereca, a
Mexican citizen, standing in Mexico. Hernandez's family sued, asserting a
number of claims against the United States, the border patrol agent, and the
agent's supervisors. For the following reasons, we AFFIRM the judgments in
favor of the United States and the supervisors, but we REVERSE the judgment
in favor of the border patrol agent.

## I. BACKGROUND

Appellants' complaint sets forth the following factual allegations. On June
7, 2010, Sergio Adrian Hernandez Guereca, a fifteen-year-old Mexican national,

2

No. 11-50792

was gathered with a group of friends on the Mexican side of a cement culvert that separates the United States and Mexico.[1]  Hernandez and his friends were playing a game that involved running up the incline of the culvert, touching the barbed-wire fence separating Mexico and the United States, and then running back down the incline.  As they were playing, United States Border Patrol Agent Jesus Mesa, Jr. arrived on the scene and detained one of Hernandez's friends, causing Hernandez to retreat "beneath the pillars of the Paso del Norte Bridge" in Mexico to observe.  Agent Mesa, still standing in the United States, then fired at least two shots at Hernandez, one of which struck him in the face and killed him.

Hernandez's parents, Jesus C. Hernandez and Maria Guadalupe Guereca Bentacour ("the Appellants"), sued, asserting eleven claims against the United States, Agent Mesa, and unknown federal employees.  They brought the first seven claims under the Federal Tort Claims Act ("FTCA") based on multiple allegations of tortious conduct.[2]  Their next two claims asserted that the United States and the unknown federal employees had violated Hernandez's Fourth and Fifth Amendment rights by knowingly adopting inadequate procedures regarding the use of deadly force and by failing to adopt adequate procedures regarding the use of reasonable force in effecting arrests.  Their tenth claim asserted that Agent Mesa was liable under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for violating Hernandez's Fourth and Fifth Amendment rights through the use of "excessive,

---

[1] The culvert is located near the Paso del Norte Bridge in El Paso, Texas.

[2] Specifically, the FTCA claims were based on (1) assault and battery, (2) negligence, (3) Agent Mesa's use of excessive and deadly force, (4) the negligent adoption of policies that violated Hernandez's rights, (5) the negligent failure to adopt policies that would have protected Hernandez's rights, (6) the intentional adoption of policies that violated Hernandez's rights, and (7) the intentional failure to adopt policies that would have protected Hernandez's rights.

No. 11-50792

deadly force." Finally, for their eleventh claim, the Appellants invoked the district court's jurisdiction under the Alien Tort Statute ("ATS"), alleging that Hernandez "was shot in contravention of international treaties, conventions and the Laws of Nations."

The United States moved to dismiss the claims against it, which included all claims except for the *Bivens* action against Agent Mesa. As a preliminary matter, the district court determined that under the Westfall Act, 28 U.S.C. § 2679, the United States was the only proper defendant for the common law tort claims because Agent Mesa was acting in the course and scope of his employment. The Appellants did not dispute this determination, and the court substituted the United States as the only party-defendant for those claims. *See* 28 U.S.C. § 2679(b)(1) (establishing an FTCA claim against the United States as the exclusive remedy for any tort claim based on the acts of a government employee acting in the course and scope of his employment). The district court then granted the motion to dismiss, holding that the United States had not waived sovereign immunity for these claims under either the FTCA or the ATS.

After the court dismissed the claims against the United States, the Appellants amended their complaint to add four *Bivens* actions against Agent Mesa's supervisors—Ramiro Cordero, Scott Luck, Victor Manjarrez, Jr., and Carla Provost. The Appellants asserted that these supervisors violated Hernandez's Fourth and Fifth Amendment rights "by tolerating and condoning a pattern of brutality and excessive force by Border Patrol agents; systematically failing to properly and adequately monitor and investigate incidents of brutality or supervise and discipline officers involved in such misconduct; creating an environment to shield agents from liability for their wrongful conduct; and inadequately training officers and agents regarding the appropriate use and restraint of their firearms as weapons." Additionally, the Appellants alleged that the supervisors "had actual and/or constructive knowledge" that Agent

4

No. 11-50792

Mesa's conduct "posed [a] pervasive and unreasonable risk of constitutional injury" and that their response to such knowledge was "so inadequate as to show deliberate indifference or tacit authorization of alleged offensive practices."

Shortly thereafter, Agent Mesa moved to dismiss the claims against him, asserting qualified immunity and arguing that Hernandez, as an alien injured outside the United States, lacked Fourth or Fifth Amendment protections. The district court agreed and dismissed the claims against Agent Mesa. Specifically, the court relied on *United States v. Verdugo–Urquidez*, 494 U.S. 259 (1990), to hold that Hernandez could not invoke the Fourth Amendment's protection because he was an alien with no voluntary ties to the United States. The court found *Boumediene v. Bush*, 553 U.S. 723 (2008), inapplicable because *Boumediene* said nothing about "the Fourth Amendment right against unreasonable searches and seizures." The court then dismissed the Appellants' Fifth Amendment claim, holding under *Graham v. Connor*, 490 U.S. 386 (1989), that excessive force claims should be analyzed only under the Fourth Amendment.

Finally, the supervisors sought dismissal of, or alternatively summary judgment on, the remaining *Bivens* action against them. The supervisors argued that the Appellants had failed to adequately allege a violation of clearly established Fourth or Fifth Amendment rights and that, even if they had, the supervisors were not personally responsible for any constitutional violation. The Appellants responded by voluntarily dismissing Agent Luck and Agent Provost. The district court then granted summary judgment for the remaining defendants, Agent Cordero and Agent Manjarrez, holding that the Appellants had failed to show "that the Defendants were personally involved in the June 7 incident" or that there was a causal link "between the Defendants' acts or

5

omissions and a violation of Hernandez's rights."[3]  The court noted that Agent Cordero had not supervised agents in Agent Mesa's position "since 2006—four years before the June 7 incident."   Additionally, Agent Manjarrez was transferred to a different sector from Agent Mesa's "eight months before the June 7 incident."  The court found both of these gaps created "too remote a time period to raise a genuine issue of material fact that [the supervisors'] actions or omissions proximately caused [the Appellants'] harm."[4]

The Appellants timely appealed each adverse judgment, and we consolidated the appeals for review.[5]

## II. CLAIMS AGAINST THE UNITED STATES

### A. Federal Tort Claims Act

We begin with the claims asserted against the United States, specifically those asserted under the FTCA.  The FTCA "is a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment."  *United States v. Orleans*, 425 U.S. 807, 813 (1976).  The FTCA accordingly gives federal courts jurisdiction over claims against the United States for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a

---

[3] The court assumed for the sake of argument that the Appellants were entitled to invoke Fourth and Fifth Amendment protections in their claims against the supervisors.

[4] The district court also denied the Appellants' request to seek discovery for the limited purpose of uncovering the names of other individuals who had supervised Agent Mesa so that they could file a fourth amended complaint naming the new defendants.  Appellants do not argue on appeal that the court abused its discretion in denying their request.

[5] We have jurisdiction over all three appeals under 28 U.S.C. § 1291.  Both the decision to grant a motion to dismiss and the decision to grant summary judgment are reviewed de novo.  *Bass v. Stryker Corp.*, 669 F.3d 501, 506 (5th Cir. 2012); *Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 753 (5th Cir. 2011).

private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The FTCA "also limits its waiver of sovereign immunity in a number of ways." *Sosa v. Alvarez–Machain*, 542 U.S. 692, 700 (2004). The relevant limitation on the waiver of immunity here is the FTCA exception for "[a]ny claim arising in a foreign country." 28 U.S.C. § 2680(k).

The Supreme Court analyzed the scope of the FTCA's foreign country exception in *Sosa*. There, the DEA hired Mexican nationals to seize a Mexican physician believed to have participated in the interrogation and torture of a DEA agent. *Sosa*, 542 U.S. at 697–98. The physician was abducted from his house in Mexico, held overnight in a motel, and then brought to El Paso, where he was arrested by federal officers. *Id.* at 698. Upon his return to Mexico, the physician sued the United States for false arrest under the FTCA. *Id.* The Ninth Circuit held the United States liable under California law because the DEA had no authority to effect the physician's arrest and detention in Mexico. *Id.* at 699.

The Supreme Court reversed, holding that the FTCA's foreign country exception barred the claim. *See id.* at 712. The Court noted that some courts of appeals had allowed similar actions to proceed under what was known as the "headquarters doctrine," which provided that "the foreign country exception [would] not exempt the United States from suit for acts or omissions occurring here which have their operative effect in another country." *Id.* at 701 (internal quotation marks omitted). The Court, however, viewed this doctrine as inconsistent with the plain language of the foreign country exception. *See id.* Specifically, the Court found good reason "to conclude that Congress understood a claim 'arising in a foreign country' to be a claim for injury or harm occurring in a foreign country." *Id.* at 704. When the FTCA was passed, "the dominant principle in choice-of-law analysis for tort cases was *lex loci delicti:* courts generally applied the law of the place where the injury occurred." *Id.* at 705.

No. 11-50792

Thus, for plaintiffs injured in a foreign country, "the presumptive choice in American courts under the traditional rule would have been to apply foreign law to determine the tortfeasor's liability." *Id.* at 706. This was the exact result "Congress intended to avoid by the foreign country exception." *Id.* at 707. The headquarters doctrine, then, was inappropriate because its application would "result in a substantial number of cases applying the very foreign law the foreign country exception was meant to avoid." *Id.* at 710. As a result, the Court rejected the headquarters doctrine and held "that the FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred." *Id.* at 712.

Here, it is undisputed that Hernandez was standing in Mexico when he was shot. Nevertheless, the Appellants argue that Hernandez's injury occurred in the United States. Specifically, the Appellants assert an assault claim and contend that "once the gun has been cocked and aimed and the finger is on the trigger, it is not necessary to wait until the bullet strikes to invoke assault." But at all relevant times, Hernandez was standing in Mexico. Any claim will therefore necessarily be based on an injury suffered in a foreign country. Accordingly, these tort claims are barred by the foreign country exception under *Sosa.*[6]

**B. Alien Tort Statute**

The final claim against the United States was brought under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350. The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United

---

[6] The Appellants also asserted in their eighth and ninth claims that the United States was liable under the U.S. Constitution. The district court correctly determined that the United States has not waived sovereign immunity for constitutional torts, and the Appellants have not addressed the constitutional claims against the United States on appeal.

States." 28 U.S.C. § 1350. The Supreme Court has held that the ATS is a jurisdictional statute only and does not create a new cause of action for torts in violation of international law. *Sosa*, 542 U.S. at 713–14. The fact that the ATS does not establish a cause of action does not mean that the ATS has no effect. *See id.* at 714 (rejecting the argument that "the ATS was stillborn . . . without a further statute expressly authorizing adoption of causes of action"). Instead, courts are authorized under the ATS to "recognize private causes of action for certain torts in violation of the law of nations." *Id.* at 724. This authorization reflects the Supreme Court's belief that the First Congress enacted the ATS "on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time." *Id.* Courts must exercise restraint, however, in considering these causes of action and "should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms" the Court recognized. *Id.* at 725.

The Appellants believe they have satisfied this standard by alleging that the United States violated the international prohibition against "extrajudicial killings." Even assuming that to be the case, the Appellants still must show that the United States has waived sovereign immunity for this claim. Other courts to address this issue have held that the ATS does not imply any waiver of sovereign immunity. *See, e.g.*, *Tobar v. United States*, 639 F.3d 1191, 1196 (9th Cir. 2011) ("[T]he Alien Tort Statute has been interpreted as a jurisdiction statute only—it has not been held to imply any waiver of sovereign immunity." (alteration in original)); *Goldstar (Pan.) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992) (same); *Sanchez–Espinoza v. Reagan*, 770 F.2d 202, 207 (D.C. Cir. 1985) ("The Alien Tort Statute itself is not a waiver of sovereign immunity."). These courts have held that "any party asserting jurisdiction under the Alien

Tort Statute must establish, independent of that statute, that the United States has consented to suit." *Tobar*, 639 F.3d at 1196 (quoting *Goldstar*, 967 F.3d at 968.).

We agree with this interpretation of the ATS. "The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." *Freeman v. United States*, 556 F.3d 326, 334–35 (5th Cir. 2009) (quoting *Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983)) (internal quotation marks omitted). Because sovereign immunity is jurisdictional in nature, "Congress's 'waiver of [it] must be unequivocally expressed in statutory text and will not be implied.'" *Id.* at 335 (alteration in original) (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)). Nothing in the ATS indicates that Congress intended to waive the United States' sovereign immunity. The ATS simply provides, in full, as follows: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. This language contains no explicit waiver of sovereign immunity and does nothing more than establish that district courts have original jurisdiction to consider a discrete set of cases.

The Appellants must establish, independent of the ATS, that the United States has consented to suit. They have failed to do so. Though they reference several treaties to support their claim, the Appellants have not referenced any language indicating that the United States has consented to suit under any of these treaties. Accordingly, the district court properly dismissed the claim brought under the ATS.

### III. *BIVENS* ACTION AGAINST AGENT MESA

We turn now to the *Bivens* action against Agent Mesa, which requires an analysis of Agent Mesa's entitlement to qualified immunity. *See, e.g.*, *Wilson v. Layne*, 526 U.S. 603, 609 (1999). The doctrine of qualified immunity, which

operates the same under both § 1983 and *Bivens*, "protects public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011) (internal quotation marks omitted). In assessing qualified immunity, we determine "(1) whether the facts that the plaintiff has alleged make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (quoting *Brown*, 663 F.3d at 249) (internal quotation marks omitted). "A right is clearly established when 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Jones v. Lowndes Cnty.*, 678 F.3d 344, 351 (5th Cir. 2012)).

Agent Mesa attacks the Appellants' claims on both prongs of the qualified immunity analysis. His first argument, that there was no constitutional violation, is relatively straightforward: (1) any constitutional injury would have occurred in Mexico; (2) the Constitution does not guarantee rights to foreign nationals injured outside the sovereign territory of the United States; (3) therefore the Appellants cannot state a constitutional violation. This uncomplicated presentation of the Constitution's extraterritorial application, however, no longer represents the Supreme Court's view.

In *Boumediene v. Bush*, 553 U.S. 723 (2008), the Supreme Court provided its clearest articulation of the standards governing the application of constitutional principles abroad. The Court addressed whether aliens designated as enemy combatants and detained at Guantanamo Bay had the constitutional privilege of habeas corpus. 553 U.S. at 732.

In addressing this question, the Court first discussed its sparse precedent on the Constitution's geographic scope and found it to undermine "the

11

No. 11-50792

Government's argument that, at least as applied to noncitizens, the Constitution necessarily stops where *de jure* sovereignty ends." *Id.* at 755. For example, the *Insular Cases*[7] addressed "whether the Constitution, by its own force, applies in any territory that is not a State." *Id.* at 756. In those cases, the Court held that the Constitution has independent force in newly acquired territories but recognized the inherent difficulties of imposing a new legal system onto these societies. *Id.* at 757. "These considerations resulted in the doctrine of territorial incorporation, under which the Constitution applies in full in incorporated Territories surely destined for statehood but only in part in unincorporated Territories." *Id.* This doctrine illustrated that "the Court took for granted that even in unincorporated Territories the Government of the United States was bound to provide to noncitizen inhabitants 'guaranties of certain fundamental personal rights declared in the Constitution,'" while still recognizing the "inherent practical difficulties of enforcing all constitutional provisions 'always and everywhere.'" *Id.* at 758–59 (quoting *Balzac*, 258 U.S. at 312).

Similar practical considerations were apparent in *Reid v. Covert*, 354 U.S. 1 (1957). *Id.* at 759. There, the *Boumediene* Court explained, six Justices held that civilian spouses of U.S. servicemen stationed abroad could not be tried before military courts for murder and were instead entitled to a trial by jury. *See id.* at 760–61. The key disagreement between the plurality of four and the two concurring justices was over the continued precedential value of *In re Ross*, 140 U.S. 453 (1891), in which the Court had held "that under some circumstances Americans abroad have no right to indictment and trial by jury." *Id.* at 760. The four-Justice plurality sought to overrule *Ross* as "insufficiently

---

[7] "The term *Insular Cases* refers to the series of cases from *De Lima v. Bidwell*, 182 U.S. 1 (1901), to *Balzac v. Porto Rico*, 258 U.S. 298 (1922), that established the framework for selective application of the Constitution to 'unincorporated' overseas territories." Gerald L. Neuman, *The Extraterritorial Constitution After* Boumediene v. Bush, 82 S. Cal. L. Rev. 259, 263 n.22 (2009).

12

protective of the rights of American citizens," whereas the two concurring Justices sought simply to distinguish it based on "practical considerations that made jury trial a more feasible option for [the civilian spouses] than it was for the petitioner in *Ross*." *Id.* at 761. The *Boumediene* Court noted that if practical considerations were irrelevant and citizenship had been the only relevant factor in *Reid*, "it would have been necessary for the Court to overturn *Ross*," something the two concurring justices were unwilling to do. *Id.* at 761–62.

Practical considerations "weighed heavily as well in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), where the Court addressed whether habeas corpus jurisdiction extended to enemy aliens who had been convicted of violating the laws of war." *Id.* at 762. There, the prisoners were detained in Germany, and the *Eisentrager* Court "stressed the difficulties of ordering the Government to produce the prisoners in a habeas corpus proceeding," explaining that it "'would require allocation of shipping space, guarding personnel, billeting and rations' and would damage the prestige of military commanders at a sensitive time." *Id.* at 762 (quoting *Eisentrager*, 339 U.S. at 779). Though the prisoners were denied access to the writ, the *Boumediene* Court did not view the decision as having adopted "a formalistic, sovereignty-based test for determining the reach of the Suspension Clause." *Id.* Instead, the Court noted that practical considerations were integral to *Eisentrager* and stated that "[n]othing in *Eisentrager* says that *de jure* sovereignty is or has ever been the only relevant consideration in determining the geographic reach of the Constitution or of habeas corpus." *Id.* at 764.

The Court ultimately determined that all of these cases shared a common thread: "the idea that questions of extraterritoriality turn on objective factors and practical concerns, not formalism." *Id.* at 764. Based on these considerations, the Court concluded that at least three factors were relevant in determining the reach of the Suspension Clause:

No. 11-50792

> (1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ.

*Id.* at 766. After analyzing these factors and finding "few practical barriers to the running of the writ," the Court held that the Suspension Clause "has full effect at Guantanamo Bay." *Id.* at 770–71.

Thus, *Boumediene* precludes the categorical test Agent Mesa suggests. Whatever else we may derive from the decision, one principle is clear: *de jure* sovereignty is not "the only relevant consideration in determining the geographic reach of the Constitution." *Id.* at 764. Instead, *Boumediene* and the cases cited therein indicate that our inquiry involves the selective application of constitutional limitations abroad, requiring us to balance the potential of such application against countervailing government interests.[8] In other words, our inquiry is not whether a constitutional principle can be applied abroad; it is whether it should. *See Reid v. Covert*, 354 U.S. 1, 75 (1957) (Harlan, J., concurring) ("But, for me, the question is *which* guarantees of the Constitution *should* apply in view of the particular circumstances, the practical necessities, and the possible alternative which Congress had before it. The question is one of judgment, not of compulsion." (emphasis added)).

The district court concluded that *Boumediene* had no bearing on this case because it did not specifically address "the Fourth Amendment right against unreasonable searches and seizures." We disagree. Though *Boumediene*'s underlying facts concerned the Suspension Clause, its reasoning was not so narrow. The Court surveyed extraterritoriality cases involving myriad

---

[8] *See* Gerald L. Neuman, *Strangers to the Constitution* 8 (1996) (associating this approach with the concurring Justices in *Reid v. Covert* and suggesting that it "boil[s] down to a single right: the right to 'global due process'").

14

constitutional rights and spoke to the extraterritorial application of the Constitution, not simply the Suspension Clause. *See Boumediene*, 553 U.S. at 764 ("Nothing in *Eisentrager* says that *de jure* sovereignty is or has ever been the only relevant consideration in determining the geographic reach of *the Constitution* or of habeas corpus." (emphasis added)); *id.* ("[Q]uestions of extraterritoriality turn on objective factors and practical concerns, not formalism."). Our extraterritoriality analysis must therefore track *Boumediene*'s.

Specifically, three "objective factors and practical concerns" are relevant to our extraterritoriality determination: (1) the citizenship and status of the claimant, (2) the nature of the location where the constitutional violation occurred, and (3) the practical obstacles inherent in enforcing the claimed right. *Cf. id.* at 766–71. The relevant practical obstacles include the consequences for U.S. actions abroad, the substantive rules that would govern the claim, and the likelihood that a favorable ruling would lead to friction with another country's government. *See id.*; *Verdugo–Urquidez*, 494 U.S. at 273–74; *id.* at 278 (Kennedy, J., concurring). These factors are not exhaustive, as the relevant considerations may change with the facts of an individual case, but they do provide a baseline for addressing questions of extraterritoriality.

The above factors do not obviate our reliance on the text of the Constitution itself. Not all constitutional provisions will have equal extraterritorial application, if any. Some contain geographical references, but others do not. *Compare* U.S. Const. amend. XIII ("Neither slavery nor involuntary servitude[] . . . shall exist within the United States, or any place subject to their jurisdiction."), *with* U.S. Const. amend. V ("No person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."). In *Boumediene*, the "importance of the habeas right itself was an unlisted factor that . . . argued in favor of broader reach." Neuman, *The Extraterritorial*

No. 11-50792

*Constitution*, *supra*, at 287.  Accordingly, as with any case of constitutional interpretation, extraterritoriality determinations require an analysis of the operation, text, and history of the specific constitutional provision involved.

With these principles in mind, we analyze whether the Constitution may be held to apply to the Appellants' claims, beginning with those asserted under the Fourth Amendment.

## IV.  FOURTH AMENDMENT

The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  In *United States v. Verdugo–Urquidez*, 494 U.S. 259 (1990), the Supreme Court, in a 5–4 decision, addressed the question of the Fourth Amendment's extraterritorial reach.  There, the DEA cooperated with Mexican police officers to apprehend Verdugo–Urquidez, a citizen and resident of Mexico.  *Verdugo–Urquidez*, 494 U.S. at 262.  Mexican officials then authorized the DEA to search Verdugo–Urquidez's Mexican residences, and DEA agents seized a tally sheet believed to reflect the quantities of marijuana Verdugo–Urquidez had smuggled into the United States.  *Id.* at 262–63.  The district court granted Verdugo–Urquidez's motion to suppress this evidence, and the Ninth Circuit affirmed, concluding that the Fourth Amendment applied extraterritorially to the searches and that the DEA agents had failed to justify their warrantless search of the premises.  *Id.* at 263.

On appeal, the Supreme Court began its review of the Ninth Circuit's decision by focusing on the text of the Fourth Amendment.  The Court noted that the Fourth Amendment "extends its reach only to 'the people,'" which "seems to have been a term of art employed in select parts of the Constitution," including the Preamble, Article I, and the First, Second, Fourth, Ninth, and Tenth Amendments.  *Id.* at 265.  Although not conclusive, the Court found this "textual

16

exegesis" to suggest that "the people" in the Constitution "refers to a class of persons who are part of the national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* The Court then examined the history of the drafting of the Fourth Amendment and concluded that "[t]he available historical data shows . . . that the purpose of the Fourth Amendment was to protect the people of the United States against arbitrary action by their own Government; it was never suggested that the provision was intended to restrain the actions of the Federal Government against aliens outside of the United States territory." *Id.* at 266.

The Court next determined that the Ninth Circuit's global view was contrary to the Court's precedent, citing the same cases on which it would later rely in *Boumediene*. *See id.* at 268–70. The Court distinguished the cases Verdugo–Urquidez relied on, noting that those cases "establish[ed] only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *Id.* at 271. Verdugo–Urquidez, by contrast, had no "significant voluntary connection" to the United States. *Id.*

Finally, the Court addressed the practical problems with the Ninth Circuit's ruling. The Court noted that the Ninth Circuit's global rule "would apply not only to law enforcement operations abroad, but also to other foreign policy operations which might result in 'searches or seizures.'" *Id.* at 273. Because the United States "frequently employs Armed Forces outside of this country," the application of the Fourth Amendment "to those circumstances could significantly disrupt the ability of the political branches to respond to the foreign situation involving our national interest." *Id.* at 273–74. Additionally, the Court cautioned that the Ninth Circuit's rule would plunge government officials "into a sea of uncertainty as to what might be reasonable in the way of searches and seizures conducted abroad." *Id.* at 274.

17

No. 11-50792

Based on all of the above considerations, the Court rejected the application of the Fourth Amendment to Verdugo–Urquidez's case:

> We think that the text of the Fourth Amendment, its history, and our cases discussing the application of the Constitution to aliens and extraterritorially require rejection of respondent's claim. At the time of the search, he was a citizen and resident of Mexico with no voluntary attachment to the United States, and the place searched was located in Mexico. Under these circumstances, the Fourth Amendment has no application.

*Id.* at 274–75.

Justice Kennedy, one of the five Justices to join the opinion, agreed that no Fourth Amendment violation had occurred but wrote separately to explain his views, even though he did not believe them to "depart in fundamental respects from the opinion of the Court." *Id.* at 275 (Kennedy, J., concurring). Specifically, Justice Kennedy believed that "[t]he force of the Constitution is not confined because it was brought into being by certain persons who gave their immediate assent to its terms." *Id.* at 276. As a result, he could not "place any weight on the reference to 'the people' in the Fourth Amendment as a source of restricting its protections." *Id.* Instead, Justice Kennedy concluded that the "restrictions that the United States must observe with reference to aliens beyond its territory or jurisdiction depend[] . . . on general principles of interpretation, not on an inquiry as to who formed the Constitution or a construction that some rights are mentioned as being those of 'the people.'" *Id.*

For Justice Kennedy, the lesson from the Court's prior cases was "not that the Constitution 'does not apply' overseas, but that there are provisions in the Constitution which do not *necessarily* apply in all circumstances in every foreign place." *Id.* at 277 (quoting *Reid*, 354 U.S. at 74 (Harlan, J., concurring)). "In other words, . . . there is no rigid and abstract rule that Congress, as a condition precedent to exercising power over Americans overseas, must exercise it subject to all the guarantees of the Constitution, no matter what the conditions and

18

considerations are that would make adherence to a specific guarantee altogether impracticable and anomalous." *Id.* at 277–78 (citation omitted). Based on this reasoning, Justice Kennedy agreed with the Court's outcome because "[t]he conditions and considerations of this case would make adherence to the Fourth Amendment's warrant requirement impracticable and anomalous." *Id.* at 278. He noted that the "absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials all indicate that the Fourth Amendment's warrant requirement should not apply in Mexico as it does in this country." *Id.* Thus, "[f]or this reason, in addition to the other persuasive justifications stated by the Court," Justice Kennedy agreed that no violation of the Fourth Amendment had occurred. *Id.*

The district court here relied on *Verdugo–Urquidez* to hold that Hernandez could not invoke the Fourth Amendment's protection because he was an alien without sufficient, voluntary connections to the United States. The Appellants rely on Justice Kennedy's concurrence to challenge this ruling. Because Justice Kennedy did not "place any weight on the reference to 'the people' in the Fourth Amendment," the Appellants argue that only a plurality of the Court agreed that aliens must have sufficient connections to the United States to be able to invoke the Fourth Amendment's protection. Rather than apply this nonbinding "sufficient connections" test, the Appellants urge us to rely on the "practical and functional" test articulated in Justice Kennedy's concurrence, which they believe was confirmed as the appropriate test in *Boumediene*.

Despite the Appellants' arguments to the contrary, we cannot ignore a decision from the Supreme Court unless directed to do so by the Court itself. *See Ballew v. Cont'l Airlines*, 668 F.3d 777, 782 (5th Cir. 2012). While the *Boumediene* Court appears to repudiate the formalistic reasoning of

*Verdugo–Urquidez*'s sufficient connections test, courts have continued to rely on the sufficient connections test and its related interpretation of the Fourth Amendment text.    Other circuits have relied on *Verdugo–Urquidez*'s interpretation to limit the Fourth Amendment's extraterritorial effect.  *See, e.g.*, *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 997 (9th Cir. 2012) (applying the sufficient connections test in conjunction with *Boumediene*'s functional approach); *United States v. Emmanuel*, 565 F.3d 1324, 1331 (11th Cir. 2009) ("Aliens do enjoy certain constitutional rights, but not the protection of the Fourth Amendment if they have 'no previous significant voluntary connection with the United States . . . .'" (alteration in original) (quoting *Verdugo–Urquidez*, 494 U.S. at 271)).    In addition, just two weeks after the Court issued *Boumediene*, which Appellants argue essentially overrules *Verdugo–Urquidez*, the Court decided *District of Columbia v. Heller*, 554 U.S. 570 (2008), and favorably cited *Verdugo–Urquidez*'s definition of "the people." The *Heller* Court explained that "the people" referred "to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."  *Id.* at 580 (citing *Verdugo–Urquidez*, 494 U.S. at 265)).    Indeed, our own court has relied on *Verdugo–Urquidez*'s definition of "the people" in the context of the Second Amendment.  *See United States v. Portillo–Munoz*, 643 F.3d 437, 440 (5th Cir. 2011). These examples undercut the Appellants' attempt to discredit *Verdugo–Urquidez.*

We also reject the Appellants' argument that Chief Justice Rehnquist's opinion in *Verdugo–Urquidez* represented only a plurality view on the sufficient connections requirement. Justice Kennedy expressed no disagreement with the majority's justifications, instead describing them as "persuasive," 494 U.S. at 278 (Kennedy, J., concurring), and finding that his views did not "depart in fundamental respects" from those of the majority, *id.* at 275.    This is

unsurprising considering that Justice Kennedy joined the opinion of the Court. *Id.* We reject the Appellants' invitation to parse those writings in search of conflicts to nullify the Court's holding.

In sum, we are bound to apply the sufficient connections requirement of *Verdugo–Urquidez*, and we must do so in light of *Boumediene*'s general functional approach. Reconciling these approaches is not an impossible task, though, because the *Verdugo–Urquidez* Court relied on more than just the text of the Fourth Amendment to reach its holding. *See Verdugo–Urquidez*, 494 U.S. at 265 (recognizing that its "textual exegesis [was] by no means conclusive"). It relied on the history of the Amendment, *id.* at 266, prior precedent, *id.* at 268–73, and practical consequences, *id.* at 273–75—all factors that we must consider after *Boumediene*.

Under this approach, we conclude that Hernandez lacked sufficient voluntary connections with the United States to invoke the Fourth Amendment. Though Hernandez's lack of territorial presence does not place a categorical bar on the Appellants' Fourth Amendment claims, the Appellants nevertheless do not show that Hernandez formed sufficient connections with the United States. *See Boumediene*, 553 U.S. at 762–764 (rejecting formalistic, sovereignty-based test for determining extraterritorial reach); *see also Ibrahim*, 669 F.3d at 997 (noting that activities abroad can contribute to forming sufficient connections to United States). Hernandez was a citizen of Mexico, not the United States. *See Boumediene*, 553 U.S. at 766 (weighing citizenship and status of detainee in determining the reach of the Suspension Clause); *Verdugo–Urquidez*, 494 U.S. at 273 (citing cases that accord different protections to aliens than to citizens). This fact alone is not dispositive, *see Boumediene*, 553 U.S. at 766; based on the facts alleged, Hernandez lacked a sustained connection with the United States sufficient to invoke protection. Appellants only allege that Hernandez played a game that involved touching the border fence and "had no interest in entering

the United States." *See Boumediene*, 553 U.S. at 766 (noting that detainees at Guantanamo Bay have been held "for the duration of a conflict that . . . is already among the longest wars in American history"); *Verdugo–Urquidez*, 494 U.S. at 272 (noting that Verdugo–Urquidez was in the United States "for only a matter of days"); *see also Ibrahim*, 669 F.3d at 997 (holding that Ibrahim established a sufficient connection as a result of her four years studying in the United States). Appellants do not suggest that Hernandez "accepted some societal obligations," including even the obligation to comply with our immigration laws, that might have entitled him to constitutional protection. *See Verdugo–Urquidez*, 494 U.S. at 273; *Martinez–Aguero*, 459 F.3d at 625 (holding that alien's "regular and lawful entry of the United States pursuant to a valid border-crossing card and . . . acquiescence in the U.S. system of immigration constitute[d] voluntary acceptance of societal obligations, rising to the level of 'substantial connections'"). Therefore, Hernandez's voluntary connections with the United States were insufficient to invoke the Fourth Amendment.

Finally, our reluctance to extend the Fourth Amendment on these facts reflects a number of practical considerations. "The 2,000-mile-long border between Mexico and the United States is the busiest in the world, with over 350 million crossings per year." Br. of Gov't of the United Mexican States as Amicus Curiae in Support of Appellants, 2. We have long recognized this area is unique for Fourth Amendment purposes. For instance, we allow broader search powers at our international borders and their functional equivalents because "national self protection reasonably requir[es] one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in." *Almeida–Sanchez v. United States*, 413 U.S. 266, 272 (1973) (quoting *Carroll v. United States*, 267 U.S. 132, 154 (1925)) (internal quotation marks omitted). In the past decade, "the number of Border Patrol agents has doubled from approximately 10,000 to more than 21,000 agents," with most of

these agents working along the Southwest border. *Border Security, Economic Opportunity, and Immigration Modernization Act: Hearing on S. 744 Before the S. Comm. on the Judiciary*, 113th Cong. 6 (2013). The Department of Homeland Security now uses advanced technologies to monitor our borders, "including mobile surveillance units, thermal imaging systems, and large- and small-scale non-intrusive inspection equipment," as well as "124 aircraft and six Unmanned Aircraft Systems operating along the Southwest border." *Id.* at 6–7. These sophisticated systems of surveillance might carry with them a host of implications for the Fourth Amendment, *cf. Kyllo v. United States*, 533 U.S. 27, 40 (2001) (holding that when the government "uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant"), and they do not look strictly inward. We cannot know all of the circumstances in which these tools will be used to effect a search or seizure outside our borders. But we do know that, as in *Verdugo–Urquidez*, "[a]pplication of the Fourth Amendment to [these] circumstances could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest" and could also plunge Border Patrol agents "into a sea of uncertainty as to what might be reasonable in the way of searches and seizures conducted abroad." 494 U.S. at 273–74.

Thus, under the Supreme Court's directives and considering the national interests at stake along our borders, we hold that, under the circumstances presented here—an alleged seizure occurring outside our border and involving a foreign national—the Fourth Amendment does not apply.

## V. FIFTH AMENDMENT

We turn now to the Appellants' Fifth Amendment claim. The Due Process Clause of the Fifth Amendment provides, "No person shall be . . . deprived of life,

liberty, or property, without due process of law." U.S. Const. amend. V. This constitutional protection contains both a substantive and a procedural component. The substantive component "prevents the government from engaging in conduct that 'shocks the conscience' or interferes with rights 'implicit in the concept of ordered liberty,'" whereas the procedural component ensures that any government action surviving substantive due process scrutiny is "implemented in a fair manner." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (citations omitted).

The Appellants' claim implicates the substantive component of the Fifth Amendment's Due Process Clause. Specifically, the Appellants allege that Agent Mesa showed callous disregard for Hernandez's Fifth Amendment rights by using excessive, deadly force when Hernandez was unarmed and presented no threat. This type of claim is unusual because excessive-force claims are typically analyzed under the Fourth Amendment. Indeed, when the Fourth Amendment applies, excessive-force claims *must* be analyzed under that amendment. *Graham v. Connor*, 490 U.S. at 395. But when a claim is not covered by the Fourth Amendment, we have recognized that an excessive-force claim may be asserted as a violation of due process. *See, e.g.*, *Petta v. Rivera*, 143 F.3d 895, 900 (5th Cir. 1998) (concluding that the plaintiffs had "asserted a valid claim under § 1983 for a constitutional violation for excessive force under the Fourteenth Amendment"). The question now is whether this constitutional protection can be applied extraterritorially.

## A. Extraterritorial Application

The Appellants' Fifth Amendment claim is not constrained by prior precedent on extraterritoriality, unlike their claim under the Fourth Amendment. First, the Fifth Amendment's text does not limit the category of individuals entitled to protection. *See, e.g.*, *Lynch v. Cannatella*, 810 F.2d 1363, 1374–75 (5th Cir. 1987). Whereas the Fourth Amendment applies only to "the

people," a term of art, the Fifth Amendment applies by its express terms to "any person." *Id.* Therefore, our court has concluded that "[e]xcludable aliens are not non-persons." *Id.* This significantly different language leads us to the conclusion that *Verdugo–Urquidez*'s sufficient connections test, which provides a gloss for the term "the people," does not apply in interpreting the extraterritorial application of the Fifth Amendment. Additionally, the Supreme Court has recognized some Fifth Amendment protections apply extraterritorially. *See, e.g.*, *Reid*, 354 U.S. at 18–19 (plurality opinion); *id.* at 49 (Frankfurter, J., concurring) (concluding that, at least as to capital cases overseas, "the exercise of court-martial jurisdiction over civilian dependents in time of peace cannot be justified by Article I, considered in connection with the specific protections of Article III and the Fifth and Sixth Amendments"). Thus, whether the Fifth Amendment applies here depends on the objective factors and practical concerns we recognized above. *See Boumediene*, 553 U.S. at 766.

The first relevant factor is the citizenship and status of the claimant. Inside U.S. territory, a claimant's citizenship will ordinarily have no impact on whether the claimant is entitled to constitutional protection. But "[i]n cases involving the extraterritorial application of the Constitution, [the Court has] taken care to state whether the person claiming its protection is a citizen or an alien." *Verdugo–Urquidez*, 494 U.S. at 275 (Kennedy, J., concurring) (citations omitted). "The distinction between citizens and aliens follows from the undoubted proposition that the Constitution does not create, nor do general principles of law create, any juridical relation between our country and some undefined, limitless class of noncitizens who are beyond our territory." *Id.* *Boumediene* teaches that a claimant's citizenship is not dispositive, as it provided an example of a limited "class of noncitizens" entitled to constitutional protection, i.e., those detained at Guantanamo Bay. But the focus on citizenship is still important given the significance of applying constitutional protections

abroad at all, let alone to noncitizens.  Here, it is undisputed that Hernandez was a Mexican citizen with no connection to the United States.  Yet, unlike the "enemy aliens" detained during the Allied Powers' post-World War II occupation in *Eisentrager*, 339 U.S. at 765–66, or the "enemy combatants" held pursuant to the Authorization for Use of Military Force in *Boumediene*, 553 U.S. at 734, 767, Hernandez was a civilian killed outside an occupied zone or theater of war. Thus, while Hernandez's citizenship weighs against extraterritorial application, his status does not.

The second factor requires us to look at the "nature of the sites" where the alleged violation occurred.   In *Boumediene*, the Court examined the level of control the United States exerted over the site where the individual's apprehension and detention occurred.  The Court concluded that, although Guantanamo Bay was "technically outside the sovereign territory of the United States," the United States "has maintained complete and uninterrupted control of the bay for over 100 years." *Boumediene*, 553 U.S. at 764, 768.  The court looked to the "political history" of Guantanamo and took into consideration the lease agreement permitting the United States to maintain control over Guantanamo. *Id.* at 764–65.  By contrast, the Court reasoned that the United States control over Landsberg Prison in occupied Germany in the *Eisentrager* case was transient and that the United States was accountable to its "Allies for all activities occurring there." *Id.* at 768.

We therefore reject Agent Mesa's argument that *Eisentrager*—which held that enemy aliens beyond the territorial jurisdiction of any court of the United States could not invoke the protections of the Fifth Amendment—compels a result in his favor.  As mentioned above, *Boumediene* rejected such a formalistic reading of *Eisentrager*.  Although *de jure* sovereignty "is a factor that bears upon which constitutional guarantees apply," nothing "in *Eisentrager* says that *de jure*

sovereignty is or has ever been the only relevant consideration in determining the geographic reach of the Constitution." *Boumediene*, 553 U.S. at 764.

Based on the nature of the border area where the shooting occurred, we cannot say that the United States exercises no control. Unlike both Guantanamo and Landsberg Prison, this is not a case requiring constitutional application in a far-away location. Agent Mesa was standing inside the United States, an area very much within U.S. control, when he committed the act. Border Patrol agents exercise their official duties within feet of where the alleged constitutional violation occurred. In fact, agents act on or occasionally even across the border they protect. Amici for Appellants inform us that Border Patrol agents have reportedly fatally shot and killed individuals across the border in several incidents. *See* Br. of Amici Curiae Border Network for Human Rights, et al., in Support of Appellants, 8–12.[9] Therefore, in a very blunt sense, Border Patrol agents exercise hard power across the border at least as far as their U.S.-based use of force injures individuals.

*Boumediene* further instructs us to look at the political history of a location to understand how the United States might exercise control. Here, the control exercised in cross-border shootings reflects broader U.S. customs and border protection policies that expand U.S. control *beyond* the nation's territorial

---

[9] *See also More Accounts Emerge Following Deadly Border Shooting*, Nogales International, Jan. 6, 2011, http://perma.cc/Q335-QL34 (reporting that a Border Patrol agent shot and killed Mexican national Ramses Barron Torres, 17, who was standing in Nogales, Mexico); Office of Public Affairs, Dep't of Justice, *Federal Officials Close the Investigation into the Death of Ramses Barron-Torres*, Aug. 9, 2013, http://perma.cc/6Z3U-4MWJ (concluding that Barron-Torres was "on the Mexico side of the border fence when he was shot"); Office of Public Affairs, Dep't of Justice, *Federal Officials Close the Investigation into the Death of Carlos LaMadrid*, Aug. 9, 2013, http://perma.cc/H64L-AYD4 (declining to prosecute Border Patrol agent who fired at individual across border shot and killed U.S. citizen Carlos Madrid, 19, who was in the line of fire); R. Stickney, *ACLU Calls for Probe in Border Shooting*, NBC San Diego, June 22, 2011, http://perma.cc/TMD5-EMAQ (reporting that Border Patrol agent shot and killed Mexican national Jose Alfredo Yanez Reyes on Mexican side of border fence near San Diego, California).

borders. The Chief of the U.S. Border Patrol explains that U.S. border security policy "extends [the nation's] zone of security outward, ensuring that our physical border is not the first or last line of defense, but one of many." *Securing Our Borders—Operational Control and the Path Forward: Hearing Before the Subcomm. on Border and Maritime Security of the H. Comm. on Homeland Security*, 112th Cong. 8 (2011) (prepared statement of Michael J. Fisher, Chief of U.S. Border Patrol). For example, Bureau of Customs and Border Protection officials are authorized to conduct "preinspection" examination and inspection of passengers for final determination of admissibility and crew "at the port or place in foreign territory." 8 C.F.R. § 235.5(b); *see also* Ayelet Shachar, *The Shifting Border of Immigration Regulation*, 3 Stan. J. C.R. & C.L. 165, 174–77 (2007). Moreover, this recent articulation of extraterritorial policy appears to be only the latest manifestation in a long history of United States involvement beyond the U.S.-Mexico border. *See* Eva Bitran, Note, Boumediene *at the Border? The Constitution and Foreign Nationals on the U.S.-Mexico Border*, 49 Harv. C.R.-C.L. L. Rev. 229, 244–47 (2014) (collecting historical examples showing that United States "exerts and has exerted powerful influence over northern Mexico").

The Border Patrol's exercise of control through its use of force at and across the border more closely resembles the control the United States exercised in Guantanamo than it does the control over Landsberg Prison in *Eisentrager*. First, U.S. power at the border is not transient. *Boumediene* distinguished *Eisentrager* because the control the United States exercised in Landsberg Prison in *Eisentrager* was transient. But here, Border Patrol agents are not representatives of a temporary occupational force. They are influential repeat players in a "constant" border relationship. *See Boumediene*, 553 U.S. at 768–69. Second, U.S. officers at the border are not "answerable to" U.S. border partners in the way Landsberg jailers were to Allied authorities. *Id.* at 768. In fact, the

Mexican government requests that U.S. government actors are held accountable in U.S. courts for actions on Mexican territory. Br. of Gov't of the United Mexican States as Amici Curiae in Support of Appellants, 16. Therefore, this situation is different from the Allied occupation of Germany, where authorities shared accountability.

In sum, even though the United States has no formal control or de facto sovereignty over the Mexican side of the border, the heavy presence and regular activity of federal agents across a permanent border without any shared accountability weigh in favor of recognizing some constitutional reach.

Finally, we address the practical obstacles and other functional considerations extraterritorial application would present. We recognized some of the practical concerns already: the national interest in self-protection; the constant need for surveillance, often with advanced technologies; and concerns over varying degrees of reasonableness depending on an agent's location at any given time. While these practical concerns counsel against the Fourth Amendment's application, they do not carry the same weight in the Fifth Amendment context because different standards govern the respective claims.

The Fourth Amendment protects against unreasonable searches and seizures, while, in this context, the Fifth Amendment protects against arbitrary conduct that shocks the conscience. The level of egregiousness required to satisfy the latter standard militates against protecting conduct that reaches it. We abstained from placing Fourth Amendment limits on actions across the border in part to allow officials to preserve our national interest in self-protection. A reasonableness limitation would have injected uncertainty into the government's decision-making process, perhaps resulting in adverse consequences for U.S. actions abroad. That interest, however, plays no role in determining whether an alien is entitled to protection against arbitrary, conscience-shocking conduct across the border. This principle protecting

individuals from arbitrary conduct is consistent with those our government has recognized internationally,[10] and applying it here would hardly cause friction with the host government. The Mexican government submitted a brief seeking to "allay any concerns that . . . a ruling in the plaintiffs' favor would interfere with Mexico's sovereignty or otherwise create practical difficulties." Br. of Gov't of the United Mexican States as Amici Curiae in Support of Appellants 3.

Because Agent Mesa was inside our territory when he allegedly acted unconstitutionally, the United States, like in *Boumediene*, "is, for all practical purposes, answerable to no other sovereign for its acts." 553 U.S. at 770. If the Constitution does not apply here, the only check on unlawful conduct would be that which the Executive Branch provides. *Cf. Boumediene*, 553 U.S. at 765 (noting a concern that "the political branches have the power to switch the Constitution on or off at will" and would represent "a striking anomaly in our tripartite system of government"). Indeed, a strict, territorial approach would allow agents to move in and out of constitutional strictures, creating zones of lawlessness. That approach would establish a perverse rule that would treat differently two individuals subject to the same conduct merely because one managed to cross into our territory.

Significantly, recognizing extraterritorial application of the Fifth Amendment for conscience-shocking conduct would not force agents to change their conduct to conform to a newly articulated standard. We have already recognized that aliens inside our borders, even those found to be excludable, are entitled "to be free of gross physical abuse at the hands of state or federal officials." *Lynch*, 810 F.2d at 1374; *see also Martinez–Aguero*, 459 F.3d at 626 ("*Lynch* plainly confers on aliens in disputes with border agents a right to be free

---

[10] *See, e.g.*, International Covenant on Civil and Political Rights art. 6(1), Mar. 23, 1976, 999 U.N.T.S. 171 ("Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life.").

from excessive force, and no reasonable officer would believe it proper to beat a defenseless alien without provocation, as Martinez–Aguero alleges."). To extend that right to those injured across the border by U.S. officers located in the United States would have the unremarkable effect of informing federal officials that they are also prohibited from arbitrarily inflicting harm in this new, but similar, context.

We will enforce the applicable constitutional principle, unless textual, precedential, or practical barriers bar judicial redress of constitutional violations—that is, when enforcing it is not "impracticable and anomalous." *Boumediene*, 553 U.S. at 759 (quoting *Reid*, 354 U.S. at 74 (Harlan, J., concurring)). Here it is not. We therefore hold that a noncitizen injured outside the United States as a result of arbitrary official conduct by a law enforcement officer located in the United States may invoke the protections provided by the Fifth Amendment.

## B. *Bivens* Action

Next, we must address whether Appellants have a cause of action against Agent Mesa for the violations they allege. "Under *Bivens* a person may sue a federal agent for money damages when the federal agent has allegedly violated that person's constitutional rights." *Martinez–Aguero*, 459 F.3d at 622 n.1. Yet *Bivens* is "not an automatic entitlement." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). The Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001).

### 1. New Context

As a preliminary matter, then, we must decide whether this case presents a "new context" in which *Bivens* might apply. The district court concluded that this case did not present an extension of *Bivens*, because the Supreme Court had previously recognized a *Bivens* action for a claim under the Fifth Amendment.

*See Davis v. Passman*, 442 U.S. 228, 248–49 (1979) (extending *Bivens* action for employee's Fifth Amendment Due Process Clause unconstitutional gender discrimination action against congressional employer).  But the district court's conclusion overlooks the context-specific approach the Supreme Court has adopted in deciding whether to extend a *Bivens* action.  *See Malesko*, 534 U.S. at 68.  After all, the Supreme Court has since rejected implying a *Bivens* action in a different Fifth Amendment Due Process case.  *See Wilkie*, 551 U.S. at 562. (declining to recognize a *Bivens* action under the Fifth Amendment for a landowner against federal land management agents accused of harassment). Instead of an amendment-by-amendment ratification of *Bivens* actions, we are bound to examine each new context—that is, each new "potentially recurring scenario that has similar legal and factual components."  *Arar v. Ashcroft*, 585 F.3d 559, 572 (2d Cir. 2009) (en banc).  In defining that context, we describe a scenario neither too general, nor too specific.  *Id.*

This case appears to present a new context, though the category of federal defendants is not new.  In *Bivens* itself, the Supreme Court recognized a Fourth Amendment claim for unreasonable search and seizure against federal law enforcement agents.  403 U.S. 388, 397.  In addition, our Court has permitted a non-citizen to bring a *Bivens* action against Border Patrol agents for false arrest and excessive use of force under the Fourth Amendment for events occurring at the border.  *Martinez–Aguero*, 459 F.3d at 625.  Finally, our Court implicitly recognized noncitizens' rights against federal officials for Fifth Amendment gross physical abuse claims, but did not explicitly discuss whether the extension of *Bivens* in that case was appropriate.  *Lynch*, 810 F.2d 1363, 1374.  Because *Lynch* "gave the matter only cursory attention," we still need to conduct "a more complete analysis of the question."  *See Engel v. Buchan*, 710 F.3d 698, 703 (7th Cir. 2013) (conducting *Bivens* analysis even though a prior court had implicitly extended *Bivens* in the same context).  In sum, faced with a new situation, we

32

must analyze whether an individual should have a *Bivens* remedy arising under the Fifth Amendment against a federal law enforcement agent for his conscience-shocking use of excessive force across our nation's borders.

### 2. Extending *Bivens* Action

Having determined that this case raises a new context, we must decide whether to extend a *Bivens* remedy.  We first ask "whether any alternative, existing process for protecting the constitutionally recognized interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Minneci v. Pollard*, 132 S. Ct. 617, 621 (2012) (quoting *Wilkie*, 551 U.S. at 550) (alterations and internal quotation marks omitted).  Then, we ask whether, in our own judgment, "special factors counsel[] hesitation in the absence of affirmative action by Congress." *Bivens*, 403 U.S. at 396; *see also Minneci*, 132 S. Ct. at 621.

### a. Alternative Remedies

There is no question that Appellants lack any alternative remedy for their Fifth Amendment right.  An alternative, existing process merely has to "provide roughly similar incentives for potential defendants to comply with [the constitutional requirements] while also providing roughly similar compensation to victims of violations." *Engel*, 710 F.3d at 705 (alteration in original) (quoting *Minneci,* 132 S. Ct. at 625).  According to the Mexican government, the Appellants cannot sue Agent Mesa in Mexican courts, because, as long as "Agent Mesa avoids travel to Mexico, any effective and enforceable remedy against him can only come from the U.S. courts."  Br. of Gov't of the United Mexican States as Amicus Curiae for Appellants 16.  The Appellants may not sue Agent Mesa under state law either, because plaintiffs "ordinarily *cannot* bring state-law tort actions against employees of the Federal Government." *Minneci*, 132 S. Ct. at 623 (citing 28 U.S.C. §§ 2671, 2679(b)(1)  ("the Westfall Act") (substituting the United States as defendant in tort action against federal employee)); *Osborn v.*

No. 11-50792

*Haley*, 549 U.S. 225, 238, 241 (2007). Besides, as discussed above, an individual in Hernandez's position will never be able to recover under the FTCA because of the application of the foreign-country exception. *See supra* Part II.A.[11]

Appellants also do not appear to lack an alternative remedy as a result of Congress's deliberate choice. Congress has not chosen to skip over a remedy within an "elaborate, comprehensive scheme" that otherwise would cover Appellants' alleged constitutional violation. *See Bush v. Lucas,* 462 U.S. 367, 385 (1983); *see also Zuspann v. Brown*, 60 F.3d 1156, 1161 (5th Cir. 1995) (holding that Congress created a comprehensive review of veterans' benefits disputes and explicitly precluded judicial review of veterans' benefits disputes, so that Congress's failure to create a remedy against individual Veterans Affairs employees was "not an oversight"). In particular, the elaborate system of remedies and procedures under the immigration system are not relevant to this case.

In *Arar v. Ashcroft*, the Second Circuit suggested but did not decide that Congress's "substantial, comprehensive, and intricate remedial scheme in the

---

[11] The Westfall Act also shows that Congress intended to make a *Bivens* remedy available in most circumstances. The Westfall Act of 1988 expanded officer immunity by making an FTCA claim against the United States an exclusive remedy, *see* 28 U.S.C. § 2679(b)(1), but Congress also implicitly ratified the availability of an action for damages against federal officers for constitutional violations—that is, a *Bivens* action—even where FTCA claims are available, *see* 28 U.S.C. § 2679(b)(2)(A) (the exclusiveness of a remedy under the FTCA "does not extend or apply to a civil action against an employee of the Government . . . which is brought for a violation of the Constitution of the United States."). Courts have recognized that this provision expresses Congress's intent to preserve *Bivens* actions. *See, e.g.*, *Simpkins v. D.C. Gov't*, 108 F.3d 366, 371–72 (D.C. Cir. 1997) (noting that § 2679(b)(2)(A) provides an "exception for *Bivens* actions against government employees"); *Vance v. Rumsfeld*, 701 F.3d 193, 208 (7th Cir. 2012) (en banc) (Wood, J., concurring in the judgment), *cert. denied,* 133 S. Ct. 2796 (2013); *see also* James E. Pfander and David Baltmanis, *Rethinking* Bivens*: Legitimacy and Constitutional Adjudication*, 98 Geo. L.J. 117, 132–38 (2009) (arguing that Congress "joined the Court as a partner in recognizing remedies in the nature of a *Bivens* action [based on] the Westfall Act's preservation of suits for violation of the Constitution and [on] the considerations that led to its adoption."). As a result, Congress has indicated an intent to preserve the availability of *Bivens* actions at least in those instances where an alternative remedial scheme does not preclude it.

34

context of immigration" might preclude a *Bivens* remedy for a noncitizen who alleged that federal officials illegally detained him, ordered his removal to Syria, and encouraged and facilitated his interrogation under torture. 585 F.3d at 572. In *Mirmehdi v. United States*, the Ninth Circuit held that "Congress's failure to include monetary relief [ under the Immigration and Nationality Act for constitutionally invalid detention] can hardly be said to be inadvertent" in light of the frequent attention Congress has given the statute. 689 F.3d 975, 982 (9th Cir. 2011) *cert. denied,* 133 S. Ct. 2336 (2013).    But unlike those contexts—extraordinary rendition and wrongful detention pending removal proceedings, respectively—it is far from clear that Congress intended for the Immigration and Nationality Act to provide remedies (or purposefully omit them) for a situation like that in the case presented.  Quite plainly, even though Agent Mesa is an immigration law enforcement officer, *see* 8 U.S.C. § 1357 (providing law enforcement powers of immigration officers); 8 C.F.R. § 287.5 (giving law enforcements power to border patrol agents), this is not an immigration case.  After all, Agent Mesa's alleged conduct foreclosed any possibility that Hernandez would access the remedial system for removal that Congress designed.  Even had Hernandez survived, he could not have been detained by a U.S. immigration official, because he was in Mexico.  Congress has not made it clear through its regulation of immigration that it intends for persons injured by Border Patrol agents—be they citizens or not—to lack a damages remedy for unconstitutional uses of force.

Defendants Cordero and Manjarrez alternatively contend that federal law enforcement agencies provide some remedy by conducting criminal investigations of the incidents.  They point to federal homicide statutes, 18 U.S.C. §§ 1111, 1112, and criminal civil rights statutes, *id.* § 242.  Far from an adequate alternative, these procedures fail to redress the alleged harm to Appellants, and at most represent a mere "patchwork" of remedies insufficient

to overcome *Bivens*.  *See Wilkie,* 551 U.S. at 554.  Thus, for those in the Hernandez family's shoes, it is a *Bivens* remedy or nothing.  *See Bivens*, 403 U.S. at 410 (Harlan, J., concurring).

### b. Special Factors Counseling Hesitation

We proceed to step two of the *Bivens* framework, which requires us to exercise our judgment in determining whether "any special factors counsel hesitation."  We see none.

*Bivens* itself provided little guidance on what qualifies as a special factor. *Bivens*, 403 U.S. at 396.  Since then the Supreme Court and our sister circuits have identified a handful of "special factors."  *See Arar*, 585 F.3d at 573 (describing "special factors" as "an embracing category, not easily defined").  For example, one class of special factors focuses on Congress's express or implied "concerns about judicial intrusion into the sensitive work of specific classes of federal defendants."  *Engel*, 710 F.3d at 707.  The Supreme Court has especially emphasized this rationale in military contexts.  *See United States v. Stanley*, 483 U.S. 669, 683–84 (1987) (no *Bivens* action for injuries arising out of or in the course of activity incident to military service); *Chappell v. Wallace*, 462 U.S. 296, 300 (1983) (holding that "necessarily unique structure of the military" is a special factor counseling against providing *Bivens* remedy).  Other circuits have relied on that rationale to refuse to extend *Bivens* suits in a variety of cases arising from actions taken by our government in its War on Terror.  *See, e.g.*, *Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012), *cert. denied,* 132 S. Ct. 2751 (2012) (holding that constitutional separation of powers and lack of judicial competence counsel hesitation in implying *Bivens* action for enemy combatants held in military detention); *accord Vance v. Rumsfeld*, 701 F.3d 193, 200 (7th Cir. 2012) (en banc); *Ali v. Rumsfeld*, 649 F.3d 762, 773 (D.C. Cir. 2011).  One circuit has even extended that reasoning to immigration-related cases. *Mirmehdi*, 689 F.3d at 982.  Another species of special factor is the workability

of the cause of action. *See Wilkie*, 551 U.S. at 555 (doctrinal workability of cause of action).

This case does not implicate any of these special factors. Agent Mesa did not act in a military setting; nor did his actions implicate national security. Given the similarity of this case to the original *Bivens* remedy and the relative workability of the doctrine, we find no reason to hesitate in extending *Bivens* to this new context. The only argument that might cause us to decline to extend a *Bivens* remedy is the Ninth Circuit's identification of "immigration issues" writ large as necessarily creating a special factor counseling hesitation. *Mirmehdi*, 689 F.3d at 982. Yet, as our discussion of alternative remedies indicates, however, we think this case does not present an "immigration" context. Moreover, even if we did treat this case as involving an "immigration issue," we would not follow *Mirmehdi*'s analysis.

In a case brought by aliens challenging their illegal detention prior to removal proceedings, the Ninth Circuit concluded that claims pertaining to immigration "'have the natural tendency to affect diplomacy, foreign policy, and the security of the nation,' which further 'counsels hesitation' in extending *Bivens*." *Id.* (quoting *Arar*, 585 F.3d at 574). First, we decline to follow *Mirmehdi*, because the opinion unjustifiably extends the special factors identified in *Arar* well beyond that decision's specific national security "context of extraordinary rendition." *Arar*, 585 F.3d at 574. As the Second Circuit remarked with more than a dash of understatement, *Arar* "is not a typical immigration case." *Id.* at 570. In fact, the government's treatment of Arar was so anomalous that the court concluded it could not rely on the provisions of the governing immigration statute, the Immigration and Nationality Act, for any of its holding. *See id.* at 571, 573.

Second, even while we acknowledge Congress's significant interest in shaping matters of immigration policy, which "can affect trade, investment,

tourism, and diplomatic relations for the entire Nation," *Arizona v. United States*, 132 S. Ct. 2492, 2498 (2012), that fact alone does not give us cause to hesitate, let alone halt, in granting a *Bivens* remedy. The Supreme Court has recently written to emphasize the strong national interest Congress has in protecting aliens from mistreatment.[12]   *See id.*   The Court noted that immigration policy concerns the "perceptions and expectations of aliens in this country who seek the full protection of its laws," acknowledged that the "mistreatment of aliens in the United States may lead to harmful reciprocal treatment of American citizens abroad," and reaffirmed that "'[o]ne of the most important and delicate of all international relationships . . . has to do with the protection of the just rights of a country's own nationals when those nationals are in another country.'" *Id.* at 2498–99 (alteration in original) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 64 (1941)).[13]   This strong national commitment to aliens' rights not only militates in favor of a uniform, federal policy, as the Court concluded in *Arizona v. United States*; it also militates in favor of the availability of some federal remedy for mistreatment at the hands of those who enforce our

---

[12] We note that Sergio's alienage does not amount to a special factor counseling hesitation. Our circuit has previously recognized that an alien may be entitled to a damages remedy against federal officers. *See Martinez–Aguero*, 459 F.3d at 621–22 & n.1 (recognizing a *Bivens* remedy for an alien); *see also Vance*, 701 F.3d at 203 (rejecting alienage as special factor). The reason for this position is clear: to treat alienage as a special factor for not providing a damages remedy would be to double count our reasons for not providing a substantive right: having settled that Appellants are entitled to bring a claim for substantive due process under the Fifth Amendment even though Hernandez was an alien, we see no additional reason to hesitate in granting a remedy for that right. *See Davis*, 442 U.S. at 246 ("[A]lthough a suit against a Congressman for putatively unconstitutional actions taken in the course of his official conduct does raise special concerns counseling hesitation, we hold that these concerns are coextensive with the protections afforded by the Speech or Debate Clause."). The same goes for extraterritoriality. Having already concluded that the right applies extraterritorially, we think it is improper to treat the location of the injury as a factor counting against extension of the remedy.

[13] Although the Supreme Court was not called upon to decide whether these same interests also extend to aliens outside the United States who are under the control of U.S. officers within the United States, we think the principle would be no different. The same concern for the protection of the rights of aliens applies with equal force here.

immigration laws. Where those who allege mistreatment have a right but lack a remedy, as here, the Supreme Court suggests that Congress would want some remedy to be available.

Third, the case before us involves questions of precisely *Bivens*-like domestic law enforcement and nothing more. *Mirmehdi* implies that cases in the immigration context necessarily involve more than the "mere 'disclosure of normal domestic law-enforcement priorities and techniques,'" 689 F.3d at 983 (quoting *Reno v. Am.-Arab Anti–Discrim. Comm.*, 525 U.S. 471, 490 (1999)). The *Mirmehdi* court asserts such cases "often involve 'the disclosure of foreign-policy objectives and . . . foreign-intelligence products.'" *Id.* (quoting *Reno*, 525 U.S. at 490). But nothing in this case bears out that assertion. To accept that conclusion would require us to abandon our prior case law, in which we have permitted *Bivens* actions to proceed against immigration officers. *See Martinez–Aguero*, 459 F.3d at 621–25; *Lynch,* 810 F.2d at 1374. We find no reason for giving immigration officers special solicitude now.

In fact, this case presents a scenario not unlike that in *Bivens.* Just as the Seventh Circuit explained in extending a *Bivens* remedy for alleged *Brady* violations under the Due Process Clause, providing a remedy for a claim of gross physical abuse by a federal law enforcement officer presents "no great problem of judicial interference with the work of law enforcement, certainly no greater than the Fourth Amendment claim in *Bivens*." *See Engel*, 710 F.3d at 708; *cf. Malesko*, 534 U.S. at 75 (Scalia, J., concurring) (arguing that the Supreme Court should cease to extend *Bivens* actions beyond the "precise circumstances that [*Bivens*] involved"). In *Bivens*, the plaintiff brought his lawsuit against federal agents for their warrantless search of his apartment, but also for the unreasonable use of force in arresting him. *See* 403 U.S. 388, 389 ("[Bivens's] complaint asserted that the arrest and search were effected without a warrant, and that unreasonable force was employed in making the arrest; fairly read, it

alleges as well that the arrest was made without probable cause." Here, too, Appellants allege the use of unreasonable force by federal agents. The only difference is that—for the reasons stated above—the Appellants must avail themselves of the Fifth Amendment rather than the Fourth Amendment.

Moreover, "the legal standards for adjudicating the claim are well established and easily administrable." *Engel*, 710 F.3d at 708; *see Wilkie*, 551 U.S. at 555 ("defining a workable cause of action" may be a special factor). Relatedly, we foresee no "deluge" of potential claimants availing themselves of this particular *Bivens* action. *See Davis*, 442 U.S. at 248 (rejecting argument that implying *Bivens* action would cause a deluge of claims). The standards for extraterritorial application of the constitutional right and the substantive definition of that right are so stringent that the creation of a damages remedy will already limit the size of any potential class of claimants under this *Bivens* action.

Therefore, we extend a *Bivens* action in this specific context in which an individual located abroad asserts a right to be free from gross physical abuse under the Fifth Amendment against federal law enforcement agents located in the United States  based on their conscience-shocking, excessive use of force across our nation's borders.[14]

## C. Qualified Immunity

Having concluded that the Fifth Amendment does apply in this particular extraterritorial context and that *Bivens* provides a remedy, we resume the familiar qualified immunity analysis, beginning with whether Appellants have alleged a constitutional right.

### 1. Constitutional right

We first address whether the Appellants have sufficiently alleged a Fifth

---

[14] We do not rule on whether a *Bivens* action will be available beyond the scenario here. For example, we do not suggest that a *Bivens* action would be available where military personnel had allegedly violated the individual's right.

Amendment violation. The district court determined that *Graham v. Connor* precluded the Appellants' Fifth Amendment claim because Agent Mesa's "apprehension by the use of deadly force" amounted to a seizure to be analyzed under the Fourth Amendment. As mentioned above, although it is true that *Graham* requires most excessive force claims to be pursued under the Fourth Amendment rather than under the more general substantive due process standard of the Fifth and Fourteenth Amendments, that rule is not absolute. *Graham* "does not hold that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments." *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997). Instead, "*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Id.*; *see also Petta*, 143 F.3d at 900 (explaining that *Graham* rejected the substantive due process standard "only in cases in which the alleged excessive use of force arguably violated a *specific* right protected under the Bill of Rights"). "Substantive due process analysis is therefore inappropriate in this case only if [the Appellants'] claim is 'covered by' the Fourth Amendment." *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998).

The inapplicability of the Fourth Amendment in this case establishes that the Appellants' claim is not "covered by" the Fourth Amendment. Thus, *Graham* does not preclude the Appellants from asserting their claim under the Fifth Amendment. Additionally, the facts alleged in the complaint, if proven, would be sufficient to establish a Fifth Amendment violation.

To state a valid claim for a violation of substantive due process, a plaintiff must establish that the officer's actions (1) caused an injury, (2) were grossly disproportionate to the need for action under the circumstances, and (3) were

inspired by malice rather than merely careless or unwise excess of zeal so that it amounted to an abuse of official power that shocks the conscience. *Petta*, 143 F.3d at 902; *cf. Lewis*, 523 U.S. at 836 (holding that a state police officer did not violate the Fourteenth Amendment's guarantee of substantive due process by causing a person's death in a high-speed automobile chase because "only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation"); *Salerno*, 481 U.S. at 746 (noting that the substantive due process component of the Fifth Amendment "prevents the government from engaging in conduct that shocks the conscience" (citations and internal quotation marks omitted)). "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense' . . . ." *Lewis*, 523 U.S. at 846 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)).

But if ever a case could be said to present an official abuse of power so arbitrary as to shock the conscience, the Appellants have alleged it here. According to the Appellants' complaint, Hernandez had retreated behind the pillars of a bridge when, unprovoked, Agent Mesa fired two gunshots in his direction. One of the gunshots struck him in the face and killed him. On these facts, Agent Mesa had no reason to suspect that Hernandez had committed any crime or engaged in any conduct that would justify the use of any, let alone deadly, force. With no apparent justification for this action, a reasonable trier of fact could conclude that Agent Mesa "acted out of conscience-shocking malice or wantonness rather than merely careless or excessive zeal." *Petta*, 143 F.3d at 902–03. We therefore conclude that the Appellants have satisfied the first prong of the qualified immunity analysis by adequately alleging a constitutional violation.

## D.  Clearly Established Law

Finally, we must determine whether Hernandez's rights were "clearly

established" at the time of the incident. According to Agent Mesa, they were not, because the uncertainty in the law surrounding the availability of constitutional rights abroad ensured that any right we might recognize could not have been clearly established at the time of the shooting. This argument, however, misconstrues qualified immunity doctrine. "Clearly established" in this context does not refer to whether Hernandez, specifically, had the clearly established right to invoke Fifth Amendment protection at the time of the incident. It refers instead to the "objective legal reasonableness" of Agent Mesa's action, "assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19 (1982)). In other words, qualified immunity does not shield conduct that is known to be unlawful merely because it is unclear that such unlawful conduct can be challenged. That is, whether the right applied extraterritorially to Hernandez and thus whether Hernandez could assert the Fourth or Fifth Amendment right does not alter the standard for conduct under those rights. "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends" the law governing the "circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). Thus, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

No reasonable officer would have understood Agent Mesa's alleged conduct to be lawful. The obvious wrongfulness of the alleged conduct but also our precedents concerning the rights of aliens confirm this conclusion. As mentioned above, we have already recognized that aliens inside our border are entitled "to be free of gross physical abuse at the hands of state or federal officials." *Lynch*, 810 F.2d at 1374; *see also Martinez–Aguero*, 459 F.3d at 626–27 ("*Lynch* plainly

confers on aliens in disputes with border agents a right to be free from excessive force, and no reasonable officer would believe it proper to beat a defenseless alien without provocation, as Martinez–Aguero alleges.").

Agent Mesa argues that his alleged conduct was acceptable as long as its impact was felt outside our borders. This is not a reasonable misapprehension of the law entitled to immunity. It does not take a court ruling for an official to know that no concept of reasonableness could justify the unprovoked shooting of another person. *See Hope v. Pelzer*, 536 U.S. 730, 741, 745 (2002) (noting that cases involving fundamentally similar facts "are not necessary" to finding a right clearly established and holding that "obvious cruelty inherent in [prison official's] practice should have provided respondents with notice that their alleged conduct violated Hope's constitutional protection."). Accordingly, we hold that the facts alleged by the Appellants defeat Agent Mesa's claim of qualified immunity.

## VI. CLAIMS AGAINST THE SUPERVISORS

Finally, we address the constitutional claims against Agent Mesa's supervisors. "Because vicarious liability is inapplicable to *Bivens* . . . suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). The Appellants allege that the supervisors promulgated policies they knew were inadequate regarding the use of deadly force and also failed to train officers regarding the appropriate use of their firearms. As the district court noted, however, neither of the remaining supervisors was shown to have any personal involvement in the alleged constitutional violation. Specifically, the district court found that Agent Cordero "had not served as a line supervisor for agents in Agent Mesa's position since 2006"—four years before the incident—and that it had been at least eight months since Agent Manjarrez had supervised Agent Mesa. The Appellants do

not challenge these findings and point to no specific policy nor any other evidence that would suggest that the supervisors were personally responsible for the alleged constitutional violation. Under these circumstances, the district court properly granted summary judgment in favor of the supervisors.

## VII. CONCLUSION

Because the United States has not waived sovereign immunity for any of the claims asserted against it, we AFFIRM the judgment in favor of the United States. Similarly, we AFFIRM the judgment in favor of the supervisors because the Appellants have failed to establish that either supervisor was personally responsible for the alleged constitutional violations. But because we hold that the Appellants can assert a Fifth Amendment claim against Agent Mesa and that they have alleged sufficient facts to overcome qualified immunity, we REVERSE the judgment in favor of Agent Mesa and REMAND for further proceedings consistent with this opinion.

No. 11-50792

JAMES L. DENNIS, Circuit Judge, concurring in part and concurring in the judgment:

I join the court's opinion in its entirety except for Part IV, with which I agree in part and in result. In *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the Supreme Court apparently ruled that the phrase "the people" in the Fourth Amendment "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this community to be considered part of that community." *Id.* at 265. I am inclined to agree, however, with those who have suggested that the *Verdugo-Urquidez* view cannot be squared with the Court's later holding in *Boumediene v. Bush*, 553 U.S. 723 (2008), that "questions of extraterritoriality turn on objective factors, and practical concerns, not formalism." *Id.* at 764; *see* WAYNE R. LAFAVE ET AL., 2 CRIM. PROC. § 3.1(i) n.237.1 (3d ed. 2014) (citing Gerald L. Neuman, *The Extraterritorial Constitution After* Boumediene v. Bush, 82 S. CAL. L. REV. 259, 259, 272 (2008); Ellen S. Podgor, *Welcome to the Other Side of the Railroad Tracks: A Meaningless Exclusionary Rule*, 16 SW. J. INT'L L. 299, 310 (2010)); Baher Azmy, *Executive Detention,* Boumediene*, and the New Common Law of Habeas*, 95 IOWA L. REV. 445, 465 (2010); Christina Duffy Burnett, *A Convenient Constitution? Extraterritoriality After* Boumediene, 109 COLUM. L. REV. 973, 1044 (2009); Timothy Zick, *Territoriality and the First Amendment: Free Speech at—and Beyond—Our Borders*, 85 NOTRE DAME L. REV. 1543, 1614 (2010).

The Mexican government has indicated that our adjudication of the Appellants' claims, whether under the Fourth or Fifth Amendment, in this particular case would not cause any friction with its sovereign interests. However, it appears that our judicial entanglement with extraterritorial Fourth Amendment excessive-force claims would be far more likely to involve impracticable and anomalous factors than would a "shocks the conscience" Fifth Amendment claim. For these reasons, I agree with the opinion of the court in

46

No. 11-50792

declining to apply the Fourth Amendment in adjudicating the Appellants' claims but I do so out of concern for pragmatic and political questions rather than on a formal classification of the litigants involved.

No. 11-50792

HAROLD R. DeMOSS, JR., Circuit Judge, concurring in part and dissenting in part:

I join in Parts I, II, and VI of the court's opinion and I concur in the result of Part IV. For the reasons stated below, I dissent from Part V.

The majority recognizes that "it is undisputed that Hernandez was a Mexican citizen with no connection to the United States." Majority Op. at 26. Additionally, the majority states "[a]ny claim . . . [is] based on an injury suffered in a foreign country[,]" *id.* at 8, a place the majority acknowledges "the United States has no formal control or de facto sovereignty." *Id.* at 29. Nevertheless, the majority determined that the Fifth Amendment is applicable in this case. At its heart, this determination is based on the dubious assessment that there is an undefined area on the Mexican side of the U.S.–Mexico border which is analogous to the United States Naval Station at Guantanamo Bay, Cuba.

The United States' presence at Guantanamo Bay, Cuba, is based on both a lease and a treaty. *Boumediene v. Bush*, 553 U.S. 723, 764 (2008). Furthermore, "the United States 'has maintained complete and uninterrupted control of [Guantanamo Bay] for over 100 years.'" Majority Op. at 26 (quoting *Boumediene*, 553 U.S. at 768). The same cannot be said of the Mexican side of the border. I reject the proposition that occasional exercises of "hard power across the border," *id.* at 27, and practices such as "'preinspection' examination and inspection of passengers," *id.* at 28, have somehow transformed a portion of northern Mexico into anything resembling the Naval Station at Guantanamo Bay. If the fact that the "United States exerts and has exerted powerful influence over northern Mexico," *id.* (internal quotation marks and citation omitted), justifies application of the Fifth Amendment in a strip along the border, how wide is that strip? Is the Fifth Amendment applicable in all of Ciudad Juarez or even the entire state of Chihuahua? Ultimately, the majority's approach devolves into a line drawing game which is entirely unnecessary

48

because there is a border between the United States and Mexico.

To be clear, the majority's opinion represents a significant expansion of Fifth Amendment protections which is not supported by precedent. Because I am persuaded that the Fifth Amendment does not protect a non–citizen with no connections to the United States who suffered an injury in Mexico where the United States has no formal control or de facto sovereignty, I would affirm the district court's judgment in favor of Agent Mesa on the Fifth Amendment claim.