EDWARD C. PRADO, Circuit Judge,
concurring:
I agree with the en banc court’s holding that the constitutional rights asserted by 15-year-old Sergio Hernández and his family were not clearly established in 2010, when Agent Mesa fired his fatal shots across the international border. However, I am compelled to write separately in response to Judge Jones’s concurring opinion, which, in my view, sets *134 forth an oversimplified and flawed analysis of the Fifth Amendment and the Supreme Court’s extraterritoriality precedents. In her concurrence, Judge Jones offers an interpretation of the Fifth Amendment implications of Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), that is contrary to Supreme Court precedent and is certain to sow confusion in our circuit. Further, the concurrence rests on a reading of the Court’s pivotal extraterritoriality rulings in Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950), United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), and Boumediene v. Bush, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), that sacrifices nuance for an unwarranted sense of certainty.
The facts in this case — though novel— are recurring, and similar lawsuits have begun percolating in the federal courts along the border.[1] Ultimately, it will be up to the Supreme Court to decide whether its broad statements in Boumediene apply to our border with Mexico and to provide clarity to law enforcement, civilians, and the federal courts tasked with interpreting the Court’s seminal opinions on the extraterritorial reach of constitutional rights. Because the law is currently unclear, I join the en banc court’s opinion in full and write separately only to respond to Judge Jones’s concurring opinion.
I. The Applicability of the Fifth Amendment
The notion that the Fourth Amendment provides the exclusive means of relief for Hernández is rooted in a strained and incorrect reading of Graham v. Connor. The Court in Graham held that “all claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other ‘seizure’ of a free citizen should be analyzed under the Fourth Amendment and its ‘reasonableness’ standard, rather than under a ‘substantive due process’ approach.” 490 U.S. at 395, 109 S.Ct. 1865. The Court explained that “[b]ecause the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of ‘substantive due process,’ must be the guide for analyzing these claims.” M
Judge Jones’s concurrence rightly points to these portions of the Court’s opinion, but it elides key limiting phrases in each: “free citizen” and “explicit textual source.” If, as the Court held in Verdugo-Urquidez, 494 U.S. at 274-75, 110 S.Ct. 1056, the Fourth Amendment does not shield aliens located abroad (viz. non-“free citizens”), then it cannot provide “an explicit textual source of constitutional protection” to persons in Hernández’s position, and Graham ’s directive to apply the Fourth Amendment to covered excessive-force claims is simply inapt.
Indeed, as the Court explained in United States v. Lanier, 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997), “Graham ... does not hold that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments; rather, Graham simply requires that if a constitutional claim is covered by a specific constitutional provision, ... the claim must be analyzed under the standard appropriate to that specific provision,' not under the rubric of substantive due process.” Id. at *135 272 n. 7, 117 S.Ct. 1219 (emphasis added). Subsequent cases have affirmed this view. See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 843, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (“Substantive due process analysis is therefore inappropriate in this case only if respondents’ claim is ‘covered by’' the Fourth Amendment. It is not.”); Petta v. Rivera, 143 F.3d 895, 901 (5th Cir.1998) (“[A] plaintiff whose claim is not susceptible to proper analysis with reference to a specific constitutional right may still state a claim under § 1983 for á violation of his or her Fourteenth Amendment substantive due process right, and have the claim judged by the constitutional standard which governs that right.”).[2]
Hernández, a noncitizen, was fatally shot in Mexico by a U.S. government agent standing on U.S. soil. Accepting Hernández’s allegations as true, as we must on a motion to dismiss, Agent Mesa made no effort to apprehend Hernández — he detained one of Hernández’s companions, then fired his service weapon into Mexico, where Hernández hid behind the pillar of a bridge, and he ultimately left Hernández’s body where it lay. Under Verdugo-Urquidez and Lewis, the Fourth Amendment does not “cover” this claim of excessive force. I would therefore hold that Hernández may invoke the Fifth Amendment’s prohibition on constitutionally arbitrary official conduct.
II. The Extraterritoriality of the Fifth Amendment
Judge Jones’s concurrence paints our extraterritoriality case law in broad strokes, with a palette of black and white. The state of the law, as the concurrence *136 views it, permits no gray.[3] According to the concurrence, the Constitution cannot apply extraterritorially to the facts of this case because the Supreme Court has held, generally, that the Fourth and Fifth Amendments do not apply to noncitizens with no significant voluntary connection to the United States. Citing Eisentrager and Verdugo-Urquidez, the concurrence asserts that the Supreme Court has foreclosed the question before our Court. This uncomplicated view of extraterritoriality fails to exhibit due regard for the Court’s watershed opinion in Boumediene, which not only authoritatively interpreted these earlier cases but also announced the bedrock standards for determining the extraterritorial reach of the Constitution — not just the writ of habeas corpus. Applying these standards, I would • hold the Fifth Amendment applicable to the particular facts alleged by Hernández.
In Boumediene, the Court provided its clearest and most definitive articulation of the principles governing the application of constitutional provisions abroad. Although the Court was tasked with deciding the narrow question of whether aliens designated enemy combatants and detained at Guantanamo Bay had the constitutional privilege of habeas corpus, Justice Kennedy wrote a lengthy opinion for the Court that grappled with the foundations of extraterritoriality. The Court first discussed its sparse extraterritoriality precedents and found them to undermine “the Government’s argument that, at least as applied to noncitizens, the Constitution necessarily stops where de jure sovereignty ends.” Boumediene, 553 U.S. at 755, 128 S.Ct. 2229 (emphasis added). Rather, the Court read beyond the bare holdings of these cases and concluded that they shared a common thread: “the idea that questions of extraterritoriality turn on objective factors and practical concerns, not formalism.” Id. at 764, 128 S.Ct. 2229.[4] Based *137 on these considerations, the Court identified at least three factors that were relevant in determining the reach of the Suspension Clause: (1) the citizenship and status of the detainee and the quality of the process underlying this finding; (2) the nature of the sites where the apprehension and detention occurred; and (3) the practical obstacles inherent in determining the detainee’s entitlement to the writ. Id. at 766, 128 S.Ct. 2229. After analyzing these factors, the Court held that the Suspension Clause “has full effect at Guantanamo Bay.” Id. at 771,128 S.Ct. 2229.
This holding may have been limited to the Suspension Clause, but the Court’s reasoning was decidedly not so constricted. Justice Kennedy’s opinion drew from the analysis of numerous rights in numerous contexts other than habeas, id. at 755-64, 128 S.Ct. 2229, framing its review of the case law as a survey of the Court’s discussions of “the Constitution’s extraterritorial application,” id. at 755,128 S.Ct. 2229 (emphasis added). More importantly, when the Court rejected the Government’s proffered reading of Eisentrager — the case that Judge Jones’s concurrence cites as facially foreclosing Hernández’s Fifth Amendment claim[5] — it announced in no uncertain terms that “[njothing in Eisentrager says that de jure sovereignty is or has ever been the only relevant consideration in determining the geographic reach of the Constitution or of habeas corpus.” Id. at 761p, 70 S.Ct. 936 (emphasis added).[6]
*138 Boumediene, and its functionality-focused reading of the Court’s previous extraterritoriality decisions, is instructive here. Confronted with a novel extraterritoriality question, we must apply the only appropriate analytical framework the Court has given us: the Boumediene factors. Adapted to the present context, three objective factors and practical concerns are relevant to our extraterritoriality determination: (1) the citizenship and status of the claimant, (2) the nature of the location where the constitutional violation occurred, and (3) the practical obstacles inherent in enforcing the claimed right. Qf. id. at 766-71, 128 S.Ct. 2229.[7] The relevant practical obstacles include the consequences for U.S. actions abroad, the substantive rules that would govern the claim, and the likelihood that a favorable ruling would lead to friction with another country’s government. See id.; Verdugo-Urquidez, 494 U.S. at 273-74, 110 S.Ct. 1056; id. at 278, 110 S.Ct. 1056 (Kennedy, J., concurring). As the panel majority’s original opinion explained, the Boumediene factors, coupled with an analysis of the operation, text, and history of the Fifth Amendment, militate in favor of the extraterritorial application of substantive due process protections on these facts. See Hernández v. United States, 757 F.3d 249, 259-63, 267-72 (5th Cir.2014), vacated in part and reinstated in part on reh’g en banc, 785 F.3d 117 (5th Cir.2015).
In sum, were we to reach the constitutional merits, I would hold, as the vacated panel majority’s opinion did, Hernández, 757 F.3d at 272, that a noncitizen situated immediately beyond our nation’s borders may invoke the protection of the Fifth Amendment against the arbitrary use of lethal small-arms force by a U.S. government official standing on U.S. soil. To hold otherwise would enshrine an unsustainably strict, territorial approach to constitutional rights — one the Supreme Court rejected in Boumediene,[8]
*139 III. Conclusion
Contrary to Judge Jones’s concurrence, I believe that the “path of least resistance” presents a prudent course for the en banc court. The depth of our disagreement about the meaning of Boumediene, Verdugo-Urquidez, and Eisentrager is compelling evidence that the law was not clearly established at the time of the tragic events giving rise to this suit. But to affirmatively find no constitutional violation on these facts — which are without parallel in our precedents — requires a troublingly uncomplicated reading of the governing law. Just as Graham cannot be understood without Lanier and Lewis, Verdugo-Urquidez and Eisentrager cannot be understood without Boumediene. Reading these cases in context and with due regard for the novel facts presented here, it is evident that Agent Mesa’s fatal cross-border shooting of Sergio Hernández cannot be painted in the simple black and white prevalent in Judge Jones’s concurrence. It requires a shade of gray that only a careful engagement with our precedents and the record in this case can produce.
Were we in a position to reach the constitutional merits, I would hold that Agent Mesa’s actions violated Hernández’s Fifth Amendment right to be free from constitutionally arbitrary government conduct. But until the Supreme Court intervenes to clarify the reach of Boumediene and apply Justice Kennedy’s functional test to these distinct facts, I remain satisfied that the en banc court has wisely resolved this appeal on elearly-established-law grounds.
I respectfully concur in the en banc opinion.

. See, e.g., Rodriguez v. Unknown Parties, No. 4:14-cv-02251, 2014 WL 3734237 (D.Ariz. filed July 29, 2014).

. Apparently troubled by the implication that the Court in Graham excluded the class of claims at issue here from the presumptive coverage of the Fourth Amendment, Judge Jones’s concurrence imputes a restrictive meaning to the Court’s phrase “free citizens.” According to the concurrence, the Court could not have intended to permit non-citizens to assert claims for excessive force under the Fourteenth Amendment while limiting citizens to the Fourth Amendment. But this misses the point. Even if, as the concurrence suggests, the Court used this term in Graham — a case centering on the use of excessive force during an investigatory stop of a citizen, 490 U.S. at 388-89, 109 S.Ct. 1865 — to distinguish between the constitutional protections afforded to civilians, pretrial detainees, and incarcerated individuals, this says nothing about whether a claim that falls outside of these set boundaries is "covered by” the Fourth Amendment. Where, as here, a non-citizen alleges excessive force abroad, and there is no indication that the show of authority was directed at apprehension, it cannot be that the claim arises under the Fourth Amendment or not at all.
The cases the concurrence cites are not to the contrary. Cf. Lewis, 523 U.S. at 843-44, 118 S.Ct. 1708 (holding that the passenger of a vehicle being pursued by police was not "seized” during a fatal collision and therefore could assert a substantive due process claim under the Fourteenth Amendment); Albright v. Oliver, 510 U.S. 266, 273-74, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (declining to recognize a substantive due process right to be free from criminal prosecution without probable cause because the Fourth Amendment was drafted to address pretrial deprivations of liberty); Brower v. Cnty. of Inyo, 489 U.S. 593, 596-99, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (determining that the fatal use of a roadblock to terminate a suspect's flight constituted a seizure and observing that "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual’s freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement through means intentionally applied ”); Tennessee v. Garner, 471 U.S. 1, 3, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (analyzing the apprehension of a fleeing suspect through the use of deadly force as a seizure).

. The absolutism of the concurrence's analytical framework is epitomized by its phrasing of the constitutional issue in this case: "United States constitutional rights do not extend to aliens who (a) lack any connection to the United States and (b) are injured on foreign soil.'.’ All nuance is lost, and only one conclusion follows from the question presented. But there is no question that Hernández had some connection to the United States, even if not the "significant voluntary connection” required to invoke the protections of the Fourth Amendment under Verdugo-Urquidez, 494 U.S. at 271, 110 S.Ct. 1056, by virtue of the acts of Agent Mesa that originated in the United States and had their effect in Mexico. Likewise, it is misguided to focus exclusively on Hernández's location within Mexico when the bullets Agent Mesa fired from United States soil found their target. This is not a case involving a drone strike, an act of war on a distant battlefield, or law-enforcement conduct occurring entirely within another nation’s territory; it is a fatal shooting by small-arms fire in which the short distance separating those involved was bisected by an international border. These distinct facts cast doubt on the concurrence's simplistic framework and belie its warning that this case implicates "our nation's applications of force abroad.”

. Critically, while explaining its reasoning, the Court repeatedly cited Justice Kennedy's concurring opinion in Verdugo-Urquidez, in which he advocated a functional analysis of extraterritoriality. Boumediene, 553 U.S. at 759-62, 128 S.Ct. 2229. In Verdugo-Urquidez, the Court held that the Fourth Amendment had no application to DEA agents’ warrantless search of a Mexican citizen's residences in Mexico. 494 U.S. at 262, 274-75, 110 S.Ct. 1056. Although he agreed with the Court’s ultimate conclusion that no Fourth Amendment violation had occurred, Justice Kennedy wrote separately to express his view that the reach of the Constitution is not confined by the identity of the class of persons that ratified the instrument or by the text used to denominate those subject to its protection (e.g., “the people”). Id. at 275-76, 110 S.Ct. 1056 (Kennedy, J., concurring). Rather, Justice Kennedy urged a functional approach to extraterritoriality — one that he traced as far back as In re Ross, 140 U.S. 453, 11 S.Ct. 897, 35 L.Ed. 581 (1891), the *137 Insular Cases (e.g., Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901), Hawaii v. Mankichi, 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016 (1903), Dorr v. United States. 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904), and Balzac v. Porto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922)), and Reid v. Covert, 354 U.S. 1, 74, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (Harlan, J., concurring). See id. at 277-78, 110 S.Ct. 1056 ("These [extraterritoriality] authorities ... stand for .the proposition that we must interpret constitutional protections in light of the undoubted power of the United States to take actions to assert its legitimate power and authority abroad.”); id. at 278, 110 S.Ct. 1056 (analyzing the extraterritorial reach of the Fourth Amendment by determining whether "[t]he conditions and considerations of this case would make adherence to the [Amendment] ... impracticable and anomalous”).
The significance of this opinion, which evinces Justice Kennedy’s dedication to applying a functional approach to extraterritoriality even in a U.S.-Mexico cross-border law-enforcement context, cannot be understated. And it hardly bears repeating here that Justice Kennedy cast the deciding vote in both Verdugo-Urquidez and Boumediene.

. As Boumediene recognized, the ruling in Eisentrager cannot reasonably be divorced from its idiosyncratic facts: the extension of Fifth Amendment rights and the writ of habeas corpus to alleged members of the German armed forces who were captured in China, convicted of violating the laws of war, and imprisoned in occupied, post-World War II Germany. See Boumediene, 553 U.S. at 762-64, 128 S.Ct. 2229. If the enemy combatants at Guantanamo Bay were not sufficiently similar to the petitioners in Eisentrager to be bound by that case, then Hernández — an unarmed fifteen-year-old boy with the misfortune of standing on the wrong side of an international border' — certainly is not.
Furthermore, while Judge Jones's concurrence is quick to emphasize Boumediene's limited holding, it is conspicuously silent as to the significance of Eisentrager's equally narrow ruling. See Eisentrager, 339 U.S. at 785, 70 S.Ct. 936 ("We hold that the Constitution does not confer a right of personal security or an immunity from military trial and punishment upon an alien enemy engaged in the hostile service of a government at war with the United States.”). In any event, my point is not that Boumediene overruled Eisentrager, but that the 2008 case offers us the Court's authoritative reading of the 1950 case — one that eschews a formalistic approach to extraterritoriality. It is this interpretation of Eisentrager — according to which the case must be understood as consistent with the functional approach endorsed in Boumediene — -that must guide our analysis.

. Even if these statements were mere dicta, we and our fellow circuits have long recognized that the Supreme Court's words carry special weight. See Schwab v. Crosby, 451 F.3d 1308, 1325-26 (11th Cir.2006) (noting that the court has "previously recognized that dicta from the Supreme Court is not something to be lightly cast aside” and citing cases from eleven circuits expressing the deference owed to Supreme Court dicta (citation and internal quotation marks omitted)); United States v. Becton, 632 F.2d 1294, 1296 n. 3 (5th Cir.1980) ("We are not bound by dicta, even of our own court.... Dicta of the Supreme Court are, of course, another matter.”).

. Judge Jones's concurrence is of course correct that Professor Neuman, "a defender of th[e] prediction” that Boumediene may be extended to other constitutional provisions, has acknowledged “the need for refinements of the three-factor functional test.” But that is exactly what the panel majority’s original opinion suggested, see Hernández v. United States, 757 F.3d 249, 262 (5th Cir.2014), vacated in part and reinstated in part on reh’g en banc, 785 F.3d 117 (5th Cir.2015), and what federal courts of appeals are uniquely well-equipped to propound — refinements that are faithful to the Court’s opinion, which described the factors as non-exclusive and derived them from contexts in addition to habeas, see Boumediene, 553 U.S. at 766, 128 S.Ct. 2229. Moreover, Professor Neuman also reads Boumediene as a case with implications beyond habeas corpus, and he has expressed optimism about the expansion of Justice Kennedy's functional approach. See Gerald L. Neuman, Essay, Extraterritoriality and the Interest of the United States in Regulating its Own, 99 Cornell L.Rev. 1441, 1458, 1470 (2014) (observing that "[a]lthough the holding of Boumediene concerned the Suspension Clause, Justice Kennedy described his functional approach as an overall framework derived from precedents involving a variety of constitutional rights,” and concluding that "[t]he selective functional approach of Boumediene v. Bush should be developed and strengthened to reconcile commitment to constitutional values with the extraterritorial exercise of power”).

.Disturbingly, such a narrow approach could also create zones of lawlessness where the fortuity of one’s location at the time of a gunshot would mark the boundary between liability and impunity. This would result, in turn, in perverse and disturbing incentives for government agents confronted with noncitizen migrants near the border. Because directing lethal force into Mexico would violate no constitutional norms, a government agent resorting to deadly force would have every reason to fire his weapon before the migrant reaches the U.S. border, or after the migrant crosses back into Mexico, to avoid possible civil liability. By contrast, if the agent shoots while the migrant is in U.S. territory, then the Constitution is suddenly — and undesirably— implicated. And it goes without saying that if the scenario were reversed, and Mexican government agents were firing weapons across the border into the United States, unyielding conceptions of territoriality would likely fall by the wayside.
Judge Jones’s concurrence disputes the characterization of the border region as "lawless,” citing the governmental investigations into Hernández’s fatal shooting. But the fact that the United States "declined to indict Agent Mesa or grant extradition to Mexico” speaks not to the promise of accountability but to the practical obstacles associated with the criminal and political processes that exist to regulate official conduct.